NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0437n.06
Filed: May 25, 2005
File Name: 05a0437n.06
Filed: May 25, 2005

NO. 04-3238

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BRENDA TEMPLE and | ) | ON APPEAL FROM THE |
| GLENN TEMPLE, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| Plaintiffs-Appellants, | ) | DISTRICT OF OHIO |
| | ) | |
| v. | ) | |
| | ) | OPINION |
| FLEETWOOD ENTERPRISES, | ) | |
| INC., FREIGHTLINER CUSTOM | ) | |
| CHASSIS CORPORATION, and | ) | |
| CUMMINS ENGINE COMPANY, INC., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: SUHRHEINRICH and GILMAN, Circuit Judges; and ACKERMAN, District Judge.[*]

**HAROLD A. ACKERMAN, District Judge.** Plaintiffs Brenda and Glenn Temple (the "Temples") appeal from two orders of the district court granting summary judgment in favor of all of the defendants in this diversity action brought by way of state claims alleging violations of the Ohio Lemon Law, the Ohio Consumer Sales Practices Act, and the Magnuson-Moss Warranty Act, and alleging breach of warranty. The Temples' complaint arises out of their purchase of a 1998 Fleetwood motor home (the "Motor Home") and a series of problems and repairs that occurred after that purchase. For the reasons discussed below, we **AFFIRM**.

---

[*]The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

## I.    BACKGROUND

On March 12, 1998, the Temples purchased the Motor Home from Avalon R.V. Center, Inc. ("Avalon"). The Motor Home contained an engine manufactured by Defendant/Appellee Cummins Engine Company, Inc. ("Cummins"). In addition, the Motor Home contained a chassis supplied by Defendant Freightliner Custom Chassis Corp. ("Freightliner") and was assembled by Defendant/Appellee Fleetwood Motor Homes of Indiana, Inc. Defendant/Appellee Fleetwood Enterprises, Inc. ("Fleetwood") otherwise manufactured, advertised and warranted the Motor Home.

The Fleetwood warranty provides in pertinent part:

> LIMITED ONE-YEAR/THREE-YEAR WARRANTY COVERAGE PROVIDED
>
> Your new motor home, including the structure, plumbing, heating and electrical systems, and all appliances and equipment installed by the manufacturer, is warranted under normal use to be free from manufacturing defects in material or workmanship. Defects or damage to paint, graphics, exterior materials, upholstery or other appearance items that may occur prior to delivery are usually corrected during the inspection process at the manufacturing plant or the dealership.
>
> The warranty extends to the first retail purchaser and his transferee(s) and begins on the date of original retail delivery or the date the motor home is first placed into service as a rental, commercial or demonstrator unit (which ever occurs first). The warranty extends for the following periods:
>
> 1. For all defects (other than structural) the warranty extends for a period of one year from such date or until the unit has received 15,000 total miles of use as determined by the mileage shown on the odometer (which ever occurs first).
>
> * * *
>
> When the dealer does not resolve the problem:

2

If the dealer is unable or unwilling to resolve a problem which the owner is convinced is covered by the warranty, he should contact the manufacturing plant at the address listed on the next page and provide the manufacturer with a description in writing of the problem and attempts made to resolve it.

Manufacturing plant obligations:

Upon receipt of notice of a claim, where the dealer was unable or unwilling to resolve the problem, the manufacturing plant will repair or replace any parts necessary to correct defects in material or workmanship or will take other appropriate action as may be required.

* * *

What is not covered by the Express Warranty:

This warranty does not cover:

1. The automotive system (including the chassis and drive train), tires and batteries, which are covered by the separate warranties of the respective manufacturers of these components.

* * *

The manufacturer is not responsible for any undertaking, representation or warranty made by any dealer or other person beyond those expressly set forth in this warranty.

Joint Appendix ("J.A.") at 295-97. In addition to the Fleetwood warranty, the Motor Home was covered by a Cummins Base Engine Warranty that provides, in pertinent part:

The Base Engine Warranty covers any failures of the Engine which result, under normal use and service, from a defect in material or factory workmanship (Warrantable Failure). This coverage begins with the sale of the Engine by Cummins and continues for seven years or 150,000 miles (241,400 kilometers), whichever occurs first, from the date of delivery of the Engine to the first user.

J.A. at 213.

3

The Temples possessed the Motor Home from March 12, 1998 until sometime in early October 2001, when the Temples returned the Motor Home to a Fleetwood repair shop in Decatur, Indiana.

**The Temples' Complaints regarding Fleetwood in the First Year of Ownership**

As discussed later in this opinion, the key time period regarding complaints to Fleetwood was the first year of ownership pursuant to the Fleetwood warranty. The Temples accepted delivery of the Motor Home on March 12, 1998, and the one-year period concluded on March 12, 1999.

From March 13, 1998 through May 1998, the Temples noted in their Complaint History[1] that they had problems with the stove burners; the heating and air conditioning system ("HVAC"); water leakage around the windshield; the failure of the awning support arms to lock in place; the power control box; and the television set. However, these problems listed early in the Complaint History were not reported to any Fleetwood representative or other party and there were no attempts to repair the problems until the Temples finally brought the Motor Home to a Fleetwood dealer.

On June 24, 1998, the Temples complained for the first time to Avalon, the selling dealer and authorized Fleetwood agent, about the electronic control panel and wiring problems as well as the problems with the HVAC. The Temples also complained that the windshield leaked

---

[1]The Complaint History is a document created by the Temples on January 31, 2002 in order to document all of their problems with the Motor Home since its purchase. The Temples objected to Fleetwood's use of this document in its summary judgment motion. However, the district court overruled this objection, concluding that this document "appears to be [an] admission prepared by either Mr. Temple or his representative in the instant litigation" and, as such, is a good representation of the Temples' version of the facts. J.A. at 928. This Court accepts this document as the Temples' version of the facts.

4

across the top; the defrost vent was cracked; the water pump was excessively noisy; the towel holder in the water compartment was broken; the front storage compartment was missing a bolt; and there were some rust spots. Avalon repaired all of these items pursuant to the Fleetwood warranty. Sometime in July 1998, the Temples complained to Avalon about the power control box, which was also subsequently repaired pursuant to the Fleetwood warranty.

In December 1998, according to the Complaint History, the Temples noted the following problems: a potential oil and fuel leak; broken molding from the ceiling in the bedroom; a loose wall mirror in the galley; loose brackets causing the bedroom drawers to dangle; and improper seals on the refrigerator. They did not complain to any representative about these items. On January 8, 1999, the Temples brought the Motor Home back to Avalon to be cleaned and have the awning re-installed, services which Avalon completed at no charge. On January 12, 1999, the Temples complained to an unauthorized dealer about problems with the HVAC unit. However, the dealer could not fix the problem because it could not work on Fleetwood motor homes.

On February 25, 1999, the Temples' Complaint History notes that the brake lights and turn signals were inoperable, but that the Temples could not get an appointment for warranty service and instead fixed the fuse problem themselves. Sometime in March 1999, the Temples again complained to an unauthorized dealer about problems with the HVAC unit, which the dealer could not fix because it was not authorized to work on Fleetwood motor homes. Finally, on March 11, 1999, the Complaint History notes that the Temples brought the Motor Home to another dealer to install air vent covers and a splash guard and to tighten the awning springs.

**The Temples' Complaints regarding Cummins during all years of ownership**

5

As discussed later in this opinion, the key time for the Cummins engine warranty was the first seven years of ownership or the first 150,000 miles. During the first year of ownership, on February 24, 1999, the Temples complained of a potential oil and fuel leak to an authorized Cummins dealer. However, the dealer found only two oil leaks, which the dealer then repaired at no charge pursuant to the Cummins warranty. Then, on March 1, 1999, the Temples complained about a fuel leak to another authorized Cummins dealer. That dealer found a fuel leak in the #5 injector fuel line and fixed the problem. In addition, the dealer replaced a fuse to fix a problem with the engine brake. During the end of the second year of ownership, on March 10, 2000, the Temples complained of a problem with the engine's oil pressure sensor, which was repaired pursuant to the Cummins warranty.

During the end of the third year of ownership, on March 2, 2001, the Temples complained again of a problem with the engine's oil pressure sensor, a problem which was repaired by the same dealer pursuant to the Cummins warranty. A few days later, a fuel leak developed in the #5 fuel injector line. This was the same fuel injector line that had been repaired two years earlier. The Temples brought the Motor Home to a Cummins dealer, which repaired the problem pursuant to the Cummins warranty. Finally, the last engine-related repair took place during the fourth year of ownership. On July 24, 2001, the Motor Home broke down. Another Cummins dealer discovered that the #4 fuel injector was cracked, and repaired it pursuant to the Cummins warranty.

In all, the Temples brought the Motor Home back to Cummins for a total of six repairs to the engine: the first repair for oil leaks; a total of two repairs for the #5 fuel injector; a total of two repairs for the oil pressure sensor; and one final repair for the #4 fuel injector.

6

**The Inspections and Road Tests**

After the Temples left the Motor Home at a Fleetwood repair shop in Decatur, Indiana sometime in October 2001, the Temples' expert, Professor Louis Boehman, inspected the Motor Home on three separate occasions. On April 11, 2002, Boehman conducted his first inspection, but failed to notify any of the defendants and as such, no defendant representative was present. Later, on August 6, 2002, Boehman conducted a second inspection along with the experts on behalf of Cummins and Freightliner. The second inspection included a road test, where Boehman admitted that the Motor Home "rode fine, no problem." J.A. at 1301. Finally, a third inspection was performed by the Fleetwood expert in fall 2002. Boehman was also present for this inspection, although there was no road test.

After conducting the first inspection, Boehman produced an expert opinion calling for further inspection and did not reach a final conclusion. Boehman claimed that "[the Motor Home] is unsafe to drive until a top notch diesel technician, Cummins trained, goes through and checks out the entire fuel system." J.A. at 239. Boehman did not explain why he reached that conclusion. Boehman then produced a supplemental expert report after the second inspection and road test. In that opinion, Boehman stated that "[d]uring and after the test drive, it was noted by all present that on this occasion the high pressure fuel supply lines did not leak." J.A. at 260. However, Boehman then concluded, without explanation for his conclusion, that the 30-mile "very mild" road test was not sufficient to test the engine's ability. He also stated that the defendants' experts' conclusion that the engine had a "clean bill of health" was inappropriate in

7

light of the fact that both experts had noted a "small" oil leak at the end of the road test.[2]

In addition to these two expert reports from Boehman, the Temples also included an affidavit by Boehman in their opposition to the summary judgment motions filed by Fleetwood and Cummins. In that affidavit, Boehman for the first time offered conclusory opinions that (i) the Motor Home's engine had "problems" that "caused the engine to break down on four separate occasions"; (ii) the Motor Home's engine's "problems" "were not repaired within a reasonable number of attempts"; (iii) the Motor Home's engine's "oil pressure sending units" were "defective" due to "a defect in the manufacturing of" the Motor Home; (iv) an oil leak he claimed to have observed was "the direct result of the engine oil pressure sending units not being properly repaired within a reasonable number of attempts"; (v) "high-pressure engine fuel lines should never exhibit problems during the life of an engine"; (vi) the alleged problem, "if uncorrected," will "substantially impair the safety of the [Motor Home]," and will "impair its use and value to any reasonable consumer"; and (vii) the road test he observed on August 6, 2002 was "completely inadequate to reveal the existence of oil and fuel leak defects." J.A. at 667-70.

During his deposition, Boehman admitted that he has never performed any tests or measurements on the Motor Home's engine. Boehman further admitted that he has never performed any tests or measurements on the same model of Cummins engine. Despite this admission in his deposition, Boehman claims that the opinions expressed in his affidavit enjoy "a reasonable degree of engineering certainty," based upon his "education, training, and

---

[2] Cummins sent two experts to inspect the Motor Home on August 6, 2002. Both experts, Doug Lown and Lyn Smith, concluded that the value of the Motor Home was not affected by the "slight oil leak observed," J.A. at 266, and that the small oil leak "may be the result of the [Motor Home] setting [sic] unused and may subside with a few use cycles," J.A. at 272.

experience." J.A. at 667-71.

The Temples filed their original complaint in Ohio state court on September 28, 2001, alleging violations of the Ohio Lemon Law, Ohio Rev. Code Ann. §§ 1345.71 - .77 (1998), the Ohio Consumer Sales Practices Act ("C.S.P.A."), Ohio Rev. Code Ann. §§ 1345.01 - .13 (1998), and the Magnuson-Moss Warranty Act ("Magnuson-Moss Act"), 15 U.S.C. §§ 2301- 2312 (2000), alleging a breach of warranty claim against Fleetwood, Cummins and Freightliner. Thereafter, on October 24, 2001, the defendants filed a joint motion for removal to the District Court for the Southern District of Ohio based on diversity jurisdiction. On or about July 5, 2002, a stipulation of joinder added Fleetwood Motor Homes of Indiana, Inc. as a party defendant.

The Temples and Freightliner eventually reached a settlement agreement and the Temples voluntarily dismissed Freightliner from the case. On February 3, 2003, Cummins moved for summary judgment on all of the Temples' claims. Thereafter, on February 5, 2003, Fleetwood also moved for summary judgment on all of the Temples' claims.[3] The Temples then filed separate memoranda opposing each motion. The district court issued its ruling and opinion granting summary judgment in favor of both Cummins and Fleetwood on September 23, 2003.

Immediately after the lower court issued that ruling, Fleetwood Motor Homes of Indiana, Inc. filed its motion for summary judgment. Fleetwood Motor Homes of Indiana, Inc.'s motion for summary judgment relied entirely on the earlier motion filed by Fleetwood and the district court's ruling on that motion. The Temples never filed any opposition to this motion. On

---

[3] This motion was filed only on behalf of Fleetwood, the parent company. The district court noted in its opinion that "[w]hile it appears to the Court that all arguments made on behalf of Fleetwood Enterprises apply with equal force to Fleetwood Motor Homes of Indiana, there has been no motion for summary judgment from Fleetwood Motor Homes." *Temple v. Fleetwood Enters., Inc.*, No. 01-439, slip op. at 1-2 (S.D. Ohio Sept. 23, 2003)

December 5, 2003, the district court granted Fleetwood Motor Homes of Indiana, Inc.'s motion for summary judgment and entered an order dismissing the Temples' case in its entirety on December 8, 2003. This timely appeal followed.

## II.    DISCUSSION

This Court reviews a district court's grant of summary judgment *de novo*. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A district court faced with a summary judgment motion must view all evidence and the inferences to be drawn therefrom in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). In addition, Federal Rule of Civil Procedure 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The critical inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).

## A.    Ohio Lemon Law

The Ohio Lemon Law places a duty upon the manufacturer of a new motor vehicle to "make any repairs as are necessary to conform the vehicle to [its] express warranty" within the first year, or 18,000 miles, whichever comes first. Ohio Rev. Code Ann. § 1345.72(A). The Complaint History notes that the Motor Home reached 18,000 miles sometime in March 2000, after the first anniversary of ownership. Thus, the requisite time frame for the Ohio Lemon Law

10

claim is the first year of ownership, which was completed on March 12, 1999. The Ohio Lemon

Law "attaches a clear duty on sellers and gives them the opportunity to preclude recovery by

making prompt repairs." *Royster v. Toyota Motor Sales, U.S.A., Inc.*, 92 Ohio St. 3d 327, 329,

750 N.E.2d 531, 533 (2001). Further, the Ohio statute provides consumers with a simple remedy

should the manufacturer fail to repair the vehicle within a reasonable number of attempts. Ohio

Rev. Code Ann. § 1345.72(B) provides:

> (B) If the manufacturer, its agent, or its authorized dealer is unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any nonconformity after a reasonable number of repair attempts, the manufacturer, at the consumer's option and subject to division (D) of this section, either shall replace the motor vehicle with a new motor vehicle acceptable to the consumer or shall accept return of the vehicle from the consumer and refund each of the following:
> (1) The full purchase price;
> (2) All incidental damages, including, but not limited to, any fees charged by the lender or lessor for making or canceling the loan or lease, and any expenses incurred by the consumer as a result of the nonconformity, such as charges for towing, vehicle rental, meals, and lodging.

Thus, if a manufacturer cannot repair a new vehicle after a reasonable number of attempts, a

buyer may request a refund or a replacement. *Royster*, 92 Ohio St. 3d at 329, 750 N.E.2d at 534.

The Ohio statute contains a section entitled "Presumptions," which sets forth four

definitive methods by which a consumer can satisfy "a reasonable number of attempts." *Royster*,

92 Ohio St. at 329, 750 N.E.2d at 533. Ohio Rev. Code Ann. § 1345.73 provides:

> It shall be presumed that a reasonable number of attempts have been undertaken by the manufacturer, its dealer, or its authorized agent to conform a motor vehicle to any applicable express warranty if, during the period of one year following the date of original delivery or during the first eighteen thousand miles of operation, whichever is earlier, any of the following apply:
> (A) Substantially the same nonconformity has been subject to repair

11

three or more times and either continues to exist or recurs;
(B) The vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days;
(C) There have been eight or more attempts to repair any nonconformity;
(D) There has been at least one attempt to repair a nonconformity that results in a condition that is likely to cause death or serious bodily injury if the vehicle is driven, and the nonconformity either continues to exist or recurs.

The Ohio Supreme Court in *Royster* found that this section sets the bottom-line requirements for a car to be deemed a "lemon." The Ohio Supreme Court interpreted the provision as "the 'enough is enough' portion of the statute. That section makes the amount of repair activity on the vehicle *define* whether the vehicle is a lemon." *Royster*, 92 Ohio St. 3d at 330, 750 N.E.2d at 534 (emphasis supplied). The Supreme Court then determined that "R.C. 1345.73 is a kind of statute of limitations – it sets in well-defined terms the limit of frustration a consumer must endure." *Id.*; *see also Gen. Motors Acceptance Corp. v. Hollanshead*, 105 Ohio App. 3d 17, 23-24, 663 N.E.2d 663, 667 (1995) (affirming grant of summary judgment to defendant on Lemon Law claim where vehicle owner failed to meet any of the statutory presumptions). Thus, the Ohio Supreme Court has interpreted the Ohio Lemon Law as setting forth the number of attempts required to meet the statutory definition of "lemon." The Ohio Supreme Court has interpreted the statute that purports to establish a *presumption* of reasonableness to establish instead a *definition* of reasonableness that a consumer must meet to survive summary judgment.

The Temples contend that the district court's interpretation of the Ohio Lemon Law is incorrect because "the clear intent of the Lemon Law [is] evinced by its plain language (and Ohio case law) which established that the presumptions provided in R.C. 1345.73 are not

12

equivalent to the definition of a 'reasonable number of attempts.'" Temples' Br. at 19. The

Temples then rely on three Ohio state decisions, *Browning v. Am. Isuzu Motors, Inc.*, No. 01-

4505, 2002 WL 32063978 (Ohio Ct. C.P. July 19, 2002), *Laberdee v. Smith*, No. 95-0700, 1997

WL 808591 (Ohio Ct. C.P. July 14, 1997), and *Kademenos v. Mercedes Benz of N. Am.*, No. 98-

50, 1999 WL 174390 (Ohio Ct. App. Mar. 3, 1999), to support their position that failure to meet

the statutory presumption should not preclude them from presenting the reasonableness issue to a

jury.

To the contrary, Fleetwood and Cummins argue that the Ohio Supreme Court has clearly

established that a consumer must meet the minimum presumption set forth in Ohio Rev. Code

Ann. § 1345.73 in order to establish a Lemon Law claim. *See Royster*, 92 Ohio St. 3d at 330,

750 N.E.2d at 534-35. The *Royster* court stated that "[t]he statute does its best to avoid leaving

reasonableness open to interpretation, instead defining what is reasonable in strict terms." *Id.*

The Ohio court further explained that the General Assembly drew a bright line on

"reasonableness" in order to serve consumers and avoid litigation. *Id.* at 331, 750 N.E.2d at 535

("By leaving little room for interpretation, R.C. 1345.73 leaves little room for litigation.").

Quoting a law review article discussing the Lemon Law, the Ohio Supreme Court acknowledged

that "'the consumer need only show that his automobile has been unsuccessfully repaired the

requisite number of times and the Act takes effect.'" *Id*. (quoting Julian B. Bell, III, Comment,

*Ohio's Lemon Law: Ohio Joins the Rest of the Nation in Waging War Against the Automobile*

*Limited Warranty*, 57 U. Cin. L. Rev. 1015, 1032 (1989)). Fleetwood and Cummins contend

that implicit in that statement is the idea that if a consumer fails to meet the presumption, then

the Lemon Law does not take effect. Appellees assert that the Ohio Supreme Court has

13

interpreted the statutory "presumption" to undoubtedly "define what is reasonable in strict terms." *Id.* at 330, 750 N.E.2d at 535.

The district court, relying entirely upon the Ohio statute and the Ohio Supreme Court's decision in *Royster*, held that "the Ohio legislature has established a bright line for determining whether or not a defendant's repair attempts were reasonable. To sustain their Ohio Lemon Law claim, the Temples must prevail under the Ohio Revised Code § 1345.73 standard of reasonableness or not at all." *Temple v. Fleetwood Enters., Inc.*, No. 01-439, slip op. at 7 (S.D. Ohio Sept. 23, 2003). Ultimately, the district court determined that the number of service repairs performed by both Fleetwood and Cummins during the first year of ownership did not meet any of the statutory elements required to set forth an Ohio Lemon Law claim. We agree with the district court's interpretation of the Ohio Supreme Court's opinion in *Royster*. We find that, under the Ohio Supreme Court's interpretation, the presumptions set forth in the Ohio Lemon Law set the standard for when a vehicle will be deemed a lemon. Accordingly, if a plaintiff seeks to bring an action against a manufacturer, he or she must present facts to meet one of the standards in the statute or the plaintiff will fail to establish a prima facie case.

In their brief, the Temples argue that they complained about the HVAC problems three times to three different dealers and that the problem was never repaired. However, this argument is unpersuasive. The record demonstrates that the HVAC problem was repaired only one time. The fact that the Temples sought repair from three different dealers for the HVAC problem does not, in and of itself, meet the statutory presumption, as two of the three dealers declined to repair the HVAC problem because they were not authorized to work on Fleetwood motor homes. The Ohio Lemon Law is clearly meant to protect consumers from manufacturers' unreasonably

14

attempting to fix their vehicle on successive occasions. However, inherent in that protection is the requirement that the manufacturer actually attempt to fix the vehicle. In this case, Fleetwood cannot be held responsible for complaints to unauthorized motor home dealers who refused to repair the HVAC problem. Thus, we find that the district court properly granted summary judgment to Fleetwood when it concluded that there had not been at least three repairs to the same nonconformity. *See* Ohio Rev. Code Ann. § 1345.73(A).

The Temples also argue, in their brief and at oral argument, that they experienced 12 different defects that were covered by the Ohio Lemon Law. The district court, however, found that there were only six defects that occurred during the Lemon Law time frame. This conclusion is aptly supported by the record. Under these circumstances, the Temples have also failed to meet the statutory presumption that Fleetwood or Cummins repaired "any nonconformity" eight or more times. *See* Ohio Rev. Code Ann. § 1345.73(C). Thus, we conclude that the district court did not err in finding that the Temples failed to meet this definition.

The Temples finally argue that the #5 fuel injector leak constituted a deadly defect that meets the requirements of the Lemon Law. Specifically, the last Lemon Law definition requires that "[t]here has been at least one attempt to repair a nonconformity that results in a condition that is likely to cause death or serious bodily injury if the vehicle is driven, and the nonconformity either continues to exist or recurs." Ohio Rev. Code Ann. § 1345.73(D). The Temples' only evidence that they had met this presumption was an affidavit of Mr. Temple.[4]

---

[4]The affidavit stated specifically that:

> To me, a fuel leak is a substantial defect because I know from

15

The district court categorized Mr. Temple's affidavit as a "bald assertion" that "references no studies, expert reports, or case law" to support its conclusion. *Temple*, No. 03-439, slip op. at 9. In essence, the district court concluded that absent any sufficient evidence that the #5 fuel injector leak actually amounted to a deadly defect, summary judgment was appropriate. We agree with the district court that the Temples failed to provide appropriate evidence that the fuel leak amounted to a deadly defect. Thus, we conclude that the district court did not err in granting summary judgment to Fleetwood in light of the Temples' failure to meet any of the Lemon Law presumptions set forth in the Ohio statute.

Further, the district court also determined that the Temples could raise the Lemon Law claim only against Fleetwood and not against Cummins. The district court stated that "the [Ohio] Lemon Law creates liability for a 'single entity,' *i.e.*, the manufacturer of the completed motor vehicle." *Temple*, No. 03-439, slip op. at 7 (quoting *Rothermel v. Safari Motor Coaches, Inc.*, No. 93-7229, 1994 WL 1029332, at *3 (N.D. Ohio July 29, 1994)). Thus, the district court granted summary judgment in favor of Cummins on the Lemon Law claim.

The Ohio Lemon Law imposes liability on the "manufacturer, its dealer, or its authorized agent" of the "motor vehicle." Ohio Rev. Code Ann. § 1345.73. Under the statute, a "manufacturer" is defined as a "person who manufactures, assembles, or imports motor vehicles, including motor homes." Ohio Rev. Code Ann. § 1345.71(B) (incorporating the definition set

---

> personal experience that fuel burns and can cause a fire and can be dangerous and that if a fire happens while you are driving down the road, it would be dangerous and can cause a person to get seriously hurt.

J.A. at 532.

16

forth in Ohio Rev. Code Ann. § 4517.01(R)).  Cummins, the manufacturer of the *engine*, does

not fit into any of these descriptions.  Moreover, as explained by the district court in *Rothermel*,

the statute's remedy is designed to be used against the final manufacturer of a vehicle:

> The statute provides replacement of the vehicle or refund of the
> purchase price as optional remedies for a nonconforming vehicle.
> Oshkosh, the chassis manufacturer, does not receive the purchase
> price for its product, and once the product is sold to Safari, has no
> ownership interest in it . . . . Oshkosh therefore cannot share Safari's
> burden or benefit in returning the consumer to its presale condition.

*Rothermel*, 1994 WL 1029332, at * 3.

The decision in *Rothermel* is particularly instructive in this case.  After purchasing a

motor home, the plaintiff in *Rothermel* brought a claim pursuant to the Ohio Lemon Law against

multiple defendants, including the manufacturer of the motor home and the maker of the

component chassis.  *Id.* at *2.  In dismissing the complaint filed against the component chassis

manufacturer, the *Rothermel* court held that the term "manufacturer" applies to "a single entity,"

namely, the final "manufacturer of a finished motor home."  *Id.* at *3-*4.  In so holding, the

*Rothermel* court reasoned that courts should not be "required to determine which manufacturer

among all the component parts manufacturers is responsible for the defect which renders the

vehicle nonconforming."  *Id.* at *3.  Moreover, the court noted that the final manufacturer is not

left without remedy, for the manufacturer "has recourse against . . . the component part

manufacturers for providing defective products" should the manufacturer be sued by a consumer

under the Lemon Law.  *Id.*  Taking this law into consideration, we find that the district court

properly concluded that Cummins, the engine manufacturer here, was not the proper defendant

for the Temples' Ohio Lemon Law claim.  As such, the district court did not err in granting

summary judgment to Cummins as to this claim.

17

**B.      Ohio Consumer Sales Practices Act**

The Ohio Consumer Sales Practices Act ("CSPA") prohibits "suppliers" from

"commit[ting] an unfair or deceptive act or practice in connection with a consumer transaction."

Ohio Rev. Code Ann. § 1345.02(A).   While the CSPA does not attempt to define all deceptive

acts or practices, it does contain various examples of deceptive behavior.  Ohio Rev. Code Ann.

§ 1345.02(B) provides, in pertinent part:

> [T]he act or practice of a supplier in representing any of the following
> is deceptive:
> (1) That the subject of a consumer transaction has sponsorship,
> approval, performance characteristics, accessories, uses, or benefits
> that it does not have;
> (2) That the subject of a consumer transaction is of a particular
> standard, quality, grade, style, prescription, or model, if it is not;
> * * *
> (5) That the subject of a consumer transaction has been supplied in
> accordance with a previous representation, if it has not, . . .;
> * * *
> (7) That replacement or repair is needed, if it is not;
> * * *
> (10) That a consumer transaction involves or does not involve a
> warranty, a disclaimer of warranties or other rights, remedies, or
> obligations if the representation is false.

In addition, Ohio Rev. Code Ann. § 1345.10(C) sets forth the statute of limitations for actions

under the CSPA.  Any "action under sections 1345.01 to 1345.13 of the Revised Code may not

be brought more than two years after the occurrence of the violation which is the subject of suit."

Ohio Rev. Code Ann. § 1345.10(C); *see also Sproles v. Simpson Fence Co.*, 99 Ohio App. 3d 72,

81, 349 N.E.2d 1297, 1302 (1994) (affirming summary dismissal of plaintiff's Ohio CSPA claim

based upon alleged injury due to the defendant's defective installation of gate because the

"'occurrence of the violation' . . . was in 1985 when the gate was installed and not in April 1991

when appellant sustained his injury").

To make out a prima facie claim under the CSPA, a plaintiff must "show a material misrepresentation, deceptive act or omission" that impacted his decision to purchase the item at issue. *Mathias v. Am. Online, Inc.*, No. 79427, 2002 WL 377159, at *5 (Ohio Ct. App. Feb. 28, 2002) (citing *Janos v. Murdock*, 109 Ohio App. 3d 583, 672 N.E.2d 1021 (1996)); *see also Richards v. Beechmont Volvo*, 127 Ohio App. 3d 188, 191, 711 N.E.2d 1088, 1090 (1998) ("In order to be deceptive, and therefore actionable, a seller's act must not only be at variance with the truth but must also concern a matter that is or is likely to be material to a consumer's decision to purchase the product or service involved."). In addition, Ohio courts have held that a manufacturer's failure to repair a defect covered by a warranty can amount to a violation of the CSPA. *See Boyle v. Daimler Chrysler Corp.*, No. 2001-CA-81, 2002 WL 1881157, at *7 (Ohio Ct. App. Aug. 16, 2002); *see also Brown v. Lyons*, 43 Ohio Misc. 14, 20, 332 N.E.2d 380, 385 (Ohio Ct. C.P. 1974) ("Failure by a supplier in connection with a consumer transaction to honor express warranties, constitutes deceptive acts and practices in violation of the Ohio Consumer Sales Practices Act."). Thus, in order to make out a CSPA claim, the Temples had to present evidence that, in relation to a consumer transaction, either Fleetwood or Cummins engaged in deceptive behavior or failed to comply with a warranty.

The Temples contend in their brief that Fleetwood violated the CSPA by failing "to live up to its warranty." The district court concluded, however, that Fleetwood was entitled to summary judgment because the Temples' CSPA claim was barred by the statute's two-year statute of limitations. The district court noted that Fleetwood's warranty expired on March 12, 1999, so any breach of warranty had to occur on or before that day. However, the Temples did not file their complaint until September 14, 2001, more than two years after March 12, 1999,

19

thereby precluding their CSPA claim against Fleetwood.

The Temples ascribe error to the district court, claiming that it "miscalculated the statute of limitations under the CSPA." The Temples contend that pursuant to Ohio Rev. Code Ann. § 1345.09(C), the statute of limitations does not begin to run until the consumer discovers or should have discovered the unfair or deceptive act. In essence, the Temples request this Court to apply a discovery rule to the Ohio CSPA claim. However, the Temples' theory ignores Ohio law.

Section 1345.09 of the Ohio Revised Code provides for specific private remedies under the CSPA. A discovery rule applies only to part of the private remedy portion of the act, specifically, for "any action for rescission." The Ohio Court of Appeals reviewed the interplay between sections 1345.09 and 1345.10 in *Cypher v. Bill Swad Leasing Co.*, 36 Ohio App. 3d 200, 521 N.E.2d 1144 (1987). In *Cypher*, the appellate court explained:

> In reading R.C. 1345.09 and 1345.10 *in pari materia*, R.C. 1345.09(C) sets forth the statute of limitations for a rescission of a consumer transaction. The time within which a consumer may rescind a contract is a "reasonable time after the consumer discovers or should have discovered the ground for it" . . . . However, the discovery rule of R.C. 1345.09(C) cannot be read into R.C. 1345.10(C). R.C. 1345.10(C) sets forth an absolute two-year statute of limitations in which to file suit to recover treble damages. Thus, read *in pari materia* the very language of R.C. 1345.09(C) and 1345.10(C) would preclude the "discovery" exception to the two-year statute of limitations that is applicable in a damage action pursuant to R.C. 1345.10(C).

36 Ohio App. 3d at 202, 521 N.E.2d at 1144. In a similar case, the Ohio appellate court held that an action brought by consumers pursuant to the CSPA against a contractor who installed defective roof shingles was barred based upon the two-year statute of limitations. *Hawley v. Certainteed Corp.*, No. 99-CA-7350, 2000 WL 840508, at *2 (Ohio Ct. App. June 28, 2000). In

20

*Hawley*, the appellate court concluded that the violation of the CSPA occurred when the consumers incurred damages during the installation of the defective shingles and not when the consumers found the damage. *Id.* The court continued, "To hold otherwise would be to revive the 'discovery rule.'" *Id.* Thus, we conclude that, under Ohio law, unless they are seeking the remedy of recision, consumers are not permitted to take advantage of the "discovery rule" in order to lengthen the statute of limitations for a CSPA claim against a manufacturer who allegedly engaged in a deceptive or unfair practice.

In the present matter, the Temples are not permitted to toll the statute of limitations by claiming that the statute did not run until they knew or should have known that Fleetwood breached its warranty. We find that the statute of limitations started to run on the CSPA claim against Fleetwood as soon as Fleetwood's warranty expired. The record clearly demonstrates that Fleetwood's warranty expired on March 12, 1999. The statute of limitations expired two years later on March 12, 2001. The Temples did not file their complaint until mid-September 2001, some six months after the statute of limitations expired. Thus, we conclude that the district court properly granted summary judgment to Fleetwood as to the CSPA claim.

In its order granting summary judgment in this case, the district court also determined that the Temples' CSPA claim fails as to Cummins because the Temples both "admit that they did not read or receive any representations from Cummins prior to purchasing their vehicle." *Temple*, No. 03-479, slip op. at 10. Unfortunately, that sentence is the extent of the district court's analysis regarding the CSPA claim against Cummins, the manufacturer and warrantor of the engine. Thus, this Court must determine if the district court failed to consider any additional theories under which Cummins might be liable for an unfair or deceptive act.

21

Cummins contends, and the Temples do not dispute, that the Temples testified in their respective depositions that Cummins never made any false representations to them with regard to the Motor Home's engine either prior to the purchase or at any time thereafter.[5] Absent a showing anywhere in the record that Cummins somehow made a false representation to the Temples in relation to the engine, the Temples have failed to make out a CSPA claim against Cummins. *See Mathias*, 2002 WL 377159, at \*5 (holding that unsubstantiated allegations of a false representation to support a CSPA claim are not enough to withstand a summary judgment

---

[5] Mr. Temple's deposition contains the following exchange:

> A.  Well, only in the sense that, you know, I was supposed to get back a good vehicle after it came out of the shop and all and it wasn't.
> Q.  When you say that, did someone at Cummins say you had a good vehicle after it came out of the shop?
> A.  I suppose that would be a presumption on my part, you take it in for repairs, pay the bills and assume it's fixed.
> Q.  Beyond that presumption, did anyone at Cummins make any representations to you that you believe were incorrect?
> A.  Beyond that?  No.

J.A. at 140.  Additionally, during her deposition, Mrs. Temple could not identify any communications that occurred with Cummins:

> Q.  Have you ever had any communications with any persons from Cummins Engine?
> A.  No.
> Q.  Have you ever tried to contact Cummins Engine to complain about any aspect of the vehicle?
> A.  No.
> Q.  Did you speak with anyone from Cummins before you purchased the vehicle?
> A.  No.
> Q.  Did anyone from Cummins make any representations to you?
> A.  No.

J.A. at 224-25.

22

motion). Thus, we conclude that, in light of the absence of sufficient evidence, the lower court properly found that Cummins did not make any representations to the Temples upon which they relied. Accordingly, we affirm the district court's grant of summary judgment to Cummins on the Ohio CSPA claim.

## C. Magnuson-Moss Warranty Act/Breach of Warranty

In order to state an actionable claim of breach of warranty and/or violation of the Magnuson-Moss Act, a plaintiff must demonstrate that (i) the item at issue was subject to a warranty; (ii) the item did not conform to the warranty; (iii) the seller was given reasonable opportunity to cure any defects; and (iv) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts. *Abele v. Bayliner Marine Corp.*, 11 F. Supp. 2d 955, 961 (N.D. Ohio 1997); *see also Teerling v. Fleetwood Motor Homes*, No. 99-5926, 2001 WL 641337, at *8-*9 (N.D. Ill. June 4, 2001) (affirming grant of summary judgment on Magnuson-Moss Act claim where plaintiff could not demonstrate that defendant had failed to remedy any alleged defects in a reasonable amount of time); *Sharkus v. Daimler Chrysler Corp.*, No. 79218, 2002 WL 31319119, at *2 (Ohio Ct. App. Oct. 17, 2002) ("The Magnuson Moss Warranty Act creates a cause of action for a consumer damaged by the failure of warrantor to comply with its obligations under a written warranty or under the Act."); *Lawhorn v. Joseph Toyota, Inc.*, 141 Ohio App. 3d 153, 155, 750 N.E.2d 610, 612 (2001) ("The Act does not require that a warranty be provided, it merely requires that if a warranty is extended, [the warrantor] must comply with its terms.").

The Magnuson-Moss Act is the federal statute that sets forth guidelines, procedures and requirements for warranties, written or implied, on consumer products. *See* 15 U.S.C. §§ 2301-

23

2312.  Ultimately, the applicability of the Magnuson-Moss Act is directly dependant upon a sustainable claim for breach of warranty.  *Labonte v. Ford Motor Co.*, No. 74855, 1999 WL 809808, at *7 (Ohio Ct. App. Oct. 7, 1999).  Thus, if there exists no actionable warranty claim, there can be no violation of the Magnuson-Moss Act.  *Id.*

In determining whether or not a seller is given a reasonable amount of time or a reasonable number of attempts to cure a defect, the Magnuson-Moss Act contemplates that a seller "will be given at least two chances to remedy an alleged defect."  *Teerling*, 2001 WL 641337, at *5; *see also Marchionna v. Ford Motor Co.*, No. 94-275, 1995 WL 476591, at *11 (N.D. Ill. Aug. 10, 1995) (noting that "[t]he plurality of the word 'attempts' [in the statute] indicates that [the warrantor is] entitled to at least two . . . attempts to correct the defect").  Finally, a plaintiff bears the burden of demonstrating that the alleged breach caused him to suffer economic loss.  *Haynes*, 1990 WL 210413, at *17 (affirming dismissal of breach of warranty claim where "appellant has failed to meet her burden of proof that she suffered economic loss due to the breach of the written warranty").  Thus, in order to make out a breach of warranty and/or Magnuson-Moss violation, the Temples had to present evidence that they suffered an economic loss due to a problem with the Motor Home that was subject to a warranty and that Fleetwood and/or Cummins failed to remedy the problem pursuant to that warranty.

In their brief, the Temples contend that they presented sufficient evidence to the district court in order to defeat the motions for summary judgment and allow the breach of warranty claim to go to a jury.  Specifically, the Temples claim that they presented evidence that the defects with the Motor Home were covered by a warranty, that they gave a reasonable opportunity to the authorized dealers to repair the defects and that one or more of the defects still

24

existed after that reasonable time. Despite these contentions, the district court concluded that the evidence presented by the Temples demonstrated that there were no additional problems or defects with the Motor Home after August 2000 and that Boehman, their expert, did not find any existence of oil and fuel leaks after the August 6, 2002 road test. In its opinion, the district court did not discuss any of the defects or problems related specifically to Fleetwood and its warranty. However, a review of the record reveals that there is no evidence that any of the defects or problems directly related to Fleetwood continued to exist after the warranty period expired. Assuming that the Temples met their burden by demonstrating that the defects were subject to a warranty and that they gave a reasonable amount of time to Fleetwood for repair, this Court can still affirm the district court's grant of summary judgment because the Temples can offer no evidence that the defects complained of to Fleetwood continued to exist. Thus, we find that the district court properly granted summary judgment to Fleetwood as to the Temples' Magnuson-Moss and breach of warranty claims.

Finally, the Temples claim that the district court "simply chose to disregard the evidence put before it" and somehow drew impermissible credibility conclusions that should have been left to the trier of fact. Again, assuming that the Temples met their burden by demonstrating that the defects were subject to a warranty and that they gave a reasonable amount of time to the warrantors for repair, this Court can affirm the district court's grant of summary judgment to Cummins because the Temples failed to offer any evidence that the defects complained of to Cummins (the engine defects) continued to exist.

As with Fleetwood, the record is completely devoid of any evidence that Cummins failed to make any repairs to the engine as guaranteed by the warranty. Cummins argues that "[t]he

25

warranty does not promise that the engine would never require repairs; rather, the warranty envisions the possibility of a need for repairs, and sets out Cummins' promises with regard to engine repairs that may become necessary for the first seven years or 150,000 miles of the engine's life." Cummins' Br. at 53. The record demonstrates that Cummins fulfilled its warranty and paid for all repairs, parts and labor covered by the warranty as needed. Further, the Temples admitted at their depositions that the last problem they had with the engine occurred in August 2001 and that they were unaware of any additional engine problem when they abandoned the Motor Home to Fleetwood. J.A. at 141, 160-61, 227-30.

According to the record, Cummins repaired the Motor Home on six different occasions: one repair for oil leaks; two separate repairs for the #5 fuel injector line; two separate repairs to replace the oil pressure sensor; and one final repair for the #4 fuel injector line. Out of these six repairs, there were never more than two repairs for any one defect or nonconformity. As a matter of law, two repairs of the same item is not unreasonable pursuant to either a breach of warranty claim or the Magnuson-Moss Act. *See Teerling*, 2001 WL 641337, at *5; *Marchionna*, 1995 WL 476591, at *11. Nonetheless, even assuming that Cummins' six total repairs could be found unreasonable, this Court can still affirm the district court decision because the Temples cannot provide any evidence that engine defects still exist.

The Temples claim that the district court erred in concluding that there was no evidence of continued engine problems after August 2000. Ultimately, the Temples are correct: the record demonstrates that there were additional engine problems after August 2000, with the final engine repair taking place in August 2001. It seems as if the district court may have inadvertently used the August 2000 date in its opinion instead of the August 2001 date.

26

Nevertheless, the Temples cannot show that there existed any continued engine problems after August 2001, and this failure is still a fatal flaw in their breach of warranty and Magnuson-Moss Act claims against Cummins. Mr. Temple's deposition testimony clearly indicates that there were engine problems in both March and July of 2001; however, he also admits that the problems were repaired by Cummins in accordance with its warranty. Finally, in both of their depositions, the Temples admitted that they did not experience any additional problems after the last fuel leak in July 2001 was repaired.

Finally, the Temples contend that the report and affidavit of their expert, Boehman, demonstrates that the Motor Home continued to have fuel and oil leaks after they abandoned it in October 2001. However, a closer look at the expert report and affidavit demonstrates that any such conclusory statements are not supported by any evidence. In his affidavit, Boehman does not conclude that fuel and/or oil leaks still exist in the engine. Boehman merely suggests that the test performed on August 6, 2002 was inappropriate to determine if fuel or oil leaks still existed. However, this contention alone is not sufficient evidence that there were leaks still present in the engine to establish a breach of warranty claim. Moreover, Boehman's expert report and supplemental reports draw no conclusions whatsoever regarding the continued existence of fuel or oil leaks. At his deposition, Boehman also admitted that he never performed any tests on the Motor Home's engine in order to support his conclusions relating to the engine. In light of the clear absence of evidence, the district court did not err in concluding that there was no evidence in the record to support a finding that the problems with the Motor Home's engine continued to exist. Accordingly, we conclude that the district court properly granted summary judgment as to Cummins.

**D.**     **Summary Judgment for Fleetwood Motor Homes of Indiana, Inc.**

Finally, the Temples contend that the summary judgment motion filed on behalf of Fleetwood Motor Homes of Indiana, Inc. should not have been granted based on all of the same arguments applied to its parent company, Fleetwood. Fleetwood Motor Homes of Indiana, Inc. contends that the Temples have waived any argument on appeal because they failed even to oppose the second motion for summary judgment. It is evident from the district court's order granting this second summary judgment motion that its conclusion was based upon its reasoning in the prior opinion. In light of the foregoing discussion, it is unnecessary for this Court to determine whether the Temples actually waived their right to appeal for failure to file an opposition to the second summary judgment motion because it is clear that Fleetwood Motor Homes of Indiana, Inc. was entitled to summary judgment for all the same reasons that summary judgment was granted to Fleetwood. Thus, we find that the district court did not err in granting summary judgment to Fleetwood Motor Homes of Indiana, Inc. in its December 5, 2003 Order.

**III.     CONCLUSION**

For the foregoing reasons, we find that the district court did not err in granting summary judgment on all of Plaintiffs' claims to all of the defendants. Accordingly, we **AFFIRM** both orders by the district court in all respects.