[Cite as *Clayborne v. Mercedes-Benz USA, L.L.C.*, 2025-Ohio-283.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| MAURICE CLAYBORNE, | : | APPEAL NO. C-240098 |
| | | TRIAL NO. A-2104241 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | |
| | | *O P I N I O N* |
| MERCEDES-BENZ USA, LLC, | : | |
| | | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: January 31, 2025

*Burdge Law Office Co., LPA,* and *Scarlett M. Steuart* for Plaintiff-Appellant,

*Benesch, Friedlander, Coplan & Aronoff, LLP, James R. Bedell* and *Michael J. Meyer* for Defendant-Appellee.

**CROUSE, Judge.**

{¶1} Plaintiff-appellant Maurice Clayborne bought a new car manufactured by defendant-appellee Mercedes-Benz USA, LLC ("MBUSA"), which he claims would not unlock or start as designed on several occasions during his first year of ownership. He brought claims under Ohio's Lemon Law, the federal Magnusson-Moss Warranty Act ("MMWA"), and Ohio's Consumer Sales Practices Act ("CSPA"), but the trial court granted summary judgment for MBUSA on all claims.

{¶2} For the reasons set forth below, we hold that the trial court erred with respect to parts of Clayborne's Lemon Law claim and his MMWA claim. Clayborne's evidence demonstrated triable issues of fact regarding (1) whether Clayborne's difficulties starting his car substantially impaired his use of the vehicle, (2) whether the efforts to repair that defect took his vehicle out of service for more than 30 days within his first year of ownership, as required by the Lemon Law, and (3) whether the number of attempts to repair the defect was "reasonable" for MMWA purposes. We therefore reverse the trial court's summary judgment as to those claims and issues, affirm it as to all others, and remand the cause for further proceedings.

## I. BACKGROUND

{¶3} On December 27, 2020, Clayborne purchased a new, 2021 Mercedes-Benz CLA250 ("the vehicle") from Mercedes-Benz of Cincinnati ("MBC") for $45,530. The vehicle came with a 4-year/50,000-mile warranty. Defendant-appellee MBUSA manufactured and warranted the vehicle. MBC is an MBUSA-authorized dealer.

{¶4} Within two months of his purchase, Clayborne alleges he began to experience two apparently related issues with his vehicle. The first issue was an intermittent problem getting the vehicle to unlock (the "no-unlock issue"). Under normal conditions, Clayborne could unlock the vehicle in three ways: (1) by using a

smartphone application, (2) with his wireless key-fob, and (3) manually, by using the metal key-shank hidden inside the key-fob. When he experienced the no-unlock issue, however, Clayborne was generally unable to unlock the vehicle using either the app or key-fob. In at least some cases he could still unlock the vehicle manually, although doing so often set off the vehicle's alarm.

{¶5} The second issue concerned Clayborne's occasional inability to get the vehicle to start (the "no-start issue"). Generally, Clayborne had two means of starting the vehicle: (1) by using the smartphone app and (2) by manually pressing the start button in the cabin of the vehicle while simultaneously depressing the brake pedal. When he experienced the no-start issue, however, Clayborne generally could not start his vehicle with his app, and frequently could not start it by pressing the start button. This problem often co-occurred with the no-unlock issue, though on some occasions Clayborne was able to start his vehicle manually, despite experiencing the no-unlock issue.

{¶6} Clayborne testified in his deposition that he experienced some combination of these no-unlock and no-start issues on five occasions in his first year of ownership ("Incidents on 2/17/2021, 11/3/2021, 11/6/2021, 11/23/2021, and 11/29/2021"). This led him to bring his vehicle into MBUSA-authorized dealers for repairs associated with one or both issues on four occasions during this period ("Repairs #1-4"). The following descriptions of the incidents and repairs come from Clayborne's deposition testimony and repair invoices:

*Incident on 2/17/2021*

{¶7} On February 17, 2021, Clayborne was leaving work and went to unlock his vehicle. But he found he could not unlock it with either his key-fob or his app. Clayborne used his phone to look up how to unlock the car manually using the key-

shank, and successfully unlocked his car this way. This set off his car alarm. Clayborne was also unable to start the vehicle either by using the app or pressing the ignition button. Clayborne called for roadside assistance, but, after three hours of waiting, his car finally started, with no apparent change except for a possible increase in the temperature. Clayborne called off the roadside assistance.

*Repair #1 (2/17/2021)*

{¶8}     Immediately following this incident, Clayborne took his vehicle to MBC, complaining both about his failure to unlock his vehicle normally, and about his failure to start the vehicle. The technicians at MBC ran diagnostics but could not identify any issue. The vehicle was operating normally when Clayborne left MBC the same day.

*Incident on 11/3/2021*

{¶9}     Clayborne next had issues on the morning of November 3, 2021, when he could not start or unlock the vehicle using his key-fob or his app while trying to leave work. Clayborne did not try to unlock the vehicle manually this time, as he did not wish to set off his car alarm at his workplace again. Clayborne also could not start his vehicle using his phone app. Because he could not get into the vehicle, Clayborne did not try to start it by pressing the ignition button on this day. Clayborne had his wife pick him up and take him home from his workplace. When he returned that evening for his next shift, the vehicle functioned normally.

*Repair #2 (11/4/2021)*

{¶10} Because Clayborne was already scheduled for his 10,000-mile service appointment at MBC the following day (November 4), he elected to wait to bring the vehicle in then. He drove the vehicle to MBC, where technicians again ran diagnostics and failed to find any defects. The technicians were also unable to duplicate the errors. The vehicle was operating normally when Clayborne left with it that same day.

*Incident on 11/6/2021*

**{¶11}** The next incident occurred two days later, while Clayborne was at home. Clayborne intended to run errands, but could not get his car to unlock or start using the fob or app. He called for roadside assistance. Because he was at home, and therefore more willing to risk the alarm going off, Clayborne tried unlocking the vehicle manually while he waited for roadside assistance to arrive. The alarm went off and his hazard lights flashed. However, once he had access to the vehicle, Clayborne was able to start it by pressing the ignition button. He called off roadside assistance.

*Repair #3 (11/11/2021)*

**{¶12}** Clayborne did not bring the vehicle in for several days after this incident, instead waiting until his day off on November 11. Because MBC had failed to identify the root cause of his problem on prior occasions, Clayborne chose this time to go to Jeff Wyler Mercedes-Benz of Fort Mitchell ("JWMB"), another MBUSA-authorized dealer. The JWMB technicians performed their own diagnostics and registered no errors. They could not replicate the issue, and the vehicle was operating normally when Clayborne drove it home the next day.

*Incident on 11/23/2021*

**{¶13}** The fourth incident occurred on November 23, 2021, as Clayborne was leaving work. Clayborne testified in his deposition that the vehicle "wouldn't do anything." He could not unlock his vehicle—either using the key-fob or the app. And when he used his key to manually unlock the vehicle, the car alarm went off. Further, like the incident on 2/17/2021, Clayborne could not get the vehicle to start either using the app or by pressing the physical start button. Clayborne called his wife to pick him up, thinking that the car might start when he returned for his shift later that evening.

**{¶14}** Clayborne was correct: he was able to unlock and start the vehicle when

he returned later that day. Clayborne's wife drove the vehicle home and left her car with Clayborne at his workplace. Clayborne did not call roadside assistance on 11/23/2021. He did call dealerships about making an appointment, but ultimately did not make one, because the dealerships did not have available loaner vehicles, and because the Thanksgiving holiday was approaching.

*Incident on 11/29/2021*

**{¶15}** The final incident took place on November 29. Because of his repeated troubles unlocking the vehicle without setting off an alarm, Clayborne had begun leaving his vehicle unlocked. As he was leaving work and heading to his car on the morning of November 29, Clayborne found that he could not start the vehicle—either by using the app or by using the physical ignition button. Clayborne did not experience the no-unlock issue on this date, however, because he had left the vehicle unlocked.

*Repair #4 (11/29/2021)*

**{¶16}** Fed up with these recurring issues, Clayborne called for roadside service to come pick the vehicle up and take it to MBC, which they did that same day. For the first time, the technicians were able to replicate, identify, and correct the issues with Clayborne's vehicle. The service invoice contained the following notes:

> 10106 11 connections are clean and tight. Removed EZL and check all connection/pins/sockets for tightness—All are OK. Started removing 1 fuse at a time to duplicate the concern. When doing so, found f132 in F152/4 would cause the concern. Further investigating found that the receiving pin connector in F152/4 power supply rail is spread too far apart causing intermittent connection of the fuse. Ordered and installed new F152/4 bracket and replace F152/4 fuse power supply rail for fuse f132 (relay unit in XHPI) to remedy the

symptom. Cleared all fault codes via Xentry. Performed final road test

after repairs. Vehicle is now ready for customer handover.

Thus, it appears that the spread of a receiving pin in a "power supply rail" had caused "intermittent connection of the fuse" leading to Clayborne's issues. MBC had to wait to receive the replacement part (the "new F152/4 bracket"), which caused the repair to take more than a month. Clayborne did not drive his vehicle home until January 3, 2022. This repair seems to have resolved both the no-start and no-unlock issues, as Clayborne testified that he "believed it was fixed" from that day forward.

*Current Litigation*

**{¶17}** Clayborne filed suit against MBUSA in the Hamilton County Court of Common Pleas, asserting claims under Ohio's Lemon Law, Ohio's CSPA, and the MMWA, as well as a claim for tortious breach of warranty. Clayborne moved for partial summary judgment on liability only as to his Lemon Law claim. MBUSA responded with its own motion for summary judgment on all claims. After briefing on both motions, the trial court denied Clayborne's motion and granted summary judgment in favor of MBUSA on all claims.

**{¶18}** Clayborne timely appealed the summary judgment for MBUSA, but chose not to appeal the trial court's denial of his motion for summary judgment.

## II. STANDARD OF REVIEW

**{¶19}** In his sole assignment of error, Clayborne contends that the trial court improperly granted summary judgment in MBUSA's favor on "all of [his] claims." In his briefs, however, Clayborne's arguments pertain only to his Lemon Law, MMWA, and CSPA claims. We therefore treat his tortious-breach-of-warranty claim as abandoned.

**{¶20}** "When reviewing the decision of a trial court granting or denying a

7

party's motion for summary judgment, an appellate court applies a de novo standard of review." *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30, citing *A.J.R. v. Lute*, 2020-Ohio-5168, ¶ 15. "In order to obtain summary judgment, the movant must show that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996), citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

{¶21} Ohio courts assess these elements using a burden-shifting framework. First, a moving party must "inform[] the trial court of the basis for the party's motion and identify[] those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim." *Midland Credit Mgt., Inc. v. Naber*, 2024-Ohio-1028, ¶ 6 (1st Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Once the moving party clears this hurdle, the burden shifts to the nonmoving party to identify "specific facts showing that there is a genuine issue for trial," Civ.R. 56(C), which must be based on more than "unsupported allegations or the pleadings." *Smathers* at ¶ 31, citing *Lute* at ¶ 26. Only if the moving party clears the first hurdle, and if the nonmoving party fails to clear the second, is summary judgment appropriate under Civ.R. 56.

### III. LEMON LAW CLAIM

{¶22} "Ohio's Lemon Law is designed to protect consumers from chronically defective new automobiles. It requires new vehicles to live up to warranties given by manufacturers. The Lemon Law attaches a clear duty to sellers, and provides a clear remedy to buyers should the seller breach its duty." *Royster v. Toyota Motor Sales,*

*U.S.A.,* 2001-Ohio-212, ¶ 8.

{¶23} As we have described:

> [T]o prevail on a Lemon Law claim, a plaintiff must demonstrate: (1) the
> plaintiff is the owner of a motor vehicle covered by an express warranty;
> (2) the motor vehicle does not conform to the applicable express
> warranty; (3) the plaintiff reported the nonconformity to the
> manufacturer, its agent, or its authorized dealer within one year
> following the original date of delivery or the first 18,000 miles of
> operation, whichever is earlier; and (4) the manufacturer, its agent, or
> its authorized dealer is unable to conform the vehicle to any applicable
> express warranty by repairing or correcting a defect that substantially
> impairs the use, value, or safety of the motor vehicle, after a reasonable
> number of repair attempts.

*Lester v. FCA US LLC*, 2022-Ohio-1776, ¶ 28 (1st Dist.), citing *Diguglielmo v. FCA US LLC*, 2020-Ohio-2858, ¶ 29 (6th Dist.), and *Iams v. DaimlerChrysler Corp.*, 2007-Ohio-6709, ¶ 13 (3d Dist.). Because no party has questioned whether Clayborne has satisfied threshold issues (1), (2), and (3), our analysis pertains primarily to issue (4).

{¶24} R.C. 1345.72(A) "attaches a clear duty on sellers and gives them the opportunity to preclude recovery by making prompt repairs." *Royster* at ¶ 10. That statutory duty to repair is triggered when "[1] a new motor vehicle does not conform to any applicable express warranty and [2] the consumer reports the nonconformity to the manufacturer, its agent, or its authorized dealer during the period of one year following the date of original delivery or during the first eighteen thousand miles of operation, whichever is earlier." R.C. 1345.72(A).

{¶25} The Lemon Law creates a cause of action and a "pucker-inducing remedy" for certain breaches of this duty. *Royster*, 2001-Ohio-212, at ¶ 17. That remedy comes from R.C. 1345.72(B), which provides that, "[i]f the manufacturer, its agent, or its authorized dealer is unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any nonconformity after a reasonable number of repair attempts," then the manufacturer must either provide the consumer "with a new motor vehicle acceptable to the consumer," or pay damages equal to the "full purchase price," plus "[a]ll incidental damages."

{¶26} The Lemon Law also defines what qualifies as a "reasonable number of repair attempts," within which the manufacturer must "repair[] or correct[] any nonconformity," by setting forth strong presumptions in R.C. 1345.73(A). Although the statute provides four of these presumptions, Clayborne invokes only two: that "it shall be presumed that a reasonable number of attempts have been undertaken" if, during the statutory period, "(1) [s]ubstantially the same nonconformity has been subject to repair three or more times and either continues to exist or recurs," or if, during that same period, "(2) [t]he vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days." R.C. 1345.73(A)(1) and (A)(2).

{¶27} The Lemon Law further provides several defenses, which a manufacturer may use to escape Lemon Law liability. For example, the manufacturer may show that the court should extend the presumptive periods set forth in R.C. 1345.73(A) to accommodate "any period of time during which the vehicle could not be reasonably repaired due to war, invasion, civil unrest, strike, fire, flood, or natural disaster." R.C. 1345.73(B). The manufacturer may also invoke the statute of limitations, R.C. 1345.75(C), or prove that the "nonconformity is the result of abuse, neglect, or the unauthorized modification or alteration" of the vehicle by someone

other than the manufacturer or its dealers, R.C. 1345.75(D).

{¶28} Clayborne challenges the trial court's summary judgement in favor of MBUSA on his Lemon Law claims. Because the trial court offered several bases for its decision, Clayborne has offered several arguments for its reversal. As an initial matter, he contends the trial court erred in holding that the Lemon Law provides no remedy to consumers whose vehicles are ultimately repaired. He further argues that his evidence was sufficient to create a dispute of material fact as to whether the defects with his vehicle rose to the level of "nonconformities" under R.C. 1345.71(E), whether those nonconformities were repaired within three attempts under R.C. 1345.73(A)(1), and whether the vehicle was out-of-service for 30 days or more, per R.C. 1345.73(A)(2).

## A. Successful-Ultimate-Repair Defense

{¶29} Clayborne contends that one of the trial court's bases for granting summary judgment was its view that "no lemon law [sic] violation exist[ed] because the dealership repaired any defect," and that Clayborne had thus "been made whole." It is not obvious whether the quoted language constituted an independent basis for rejecting all of Clayborne's Lemon Law claims. But, to the extent the trial court did erect such a per se, ultimate-repair bar to Lemon Law recovery, we agree with Clayborne that it erred.

{¶30} The law is clear that eventual repair is not a defense to a Lemon Law claim. In *Royster,* the Ohio Supreme Court held that, once a consumer's "vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days in the first year of ownership," the statute presumes it to be a lemon, "regardless of whether the vehicle was successfully repaired at some point beyond that thirty-day period." *Royster*, 2001-Ohio-212, at the syllabus.

11

**{¶31}** Likewise, R.C. 1345.73(A)(1) presumes that a "reasonable number of attempts" have taken place as soon as "[s]ubstantially the same nonconformity has been subject to repair three or more times and either continues to exist or recurs." If the nonconformity "either continues to exist or recurs" after a third repair attempt, *id.*, the vehicle is a lemon; it makes no difference that the shop provides a permanent fix on attempt number four.

**{¶32}** Accordingly, we hold that no per se ultimate-repair bar existed under Ohio's Lemon Law to preclude Clayborne's claim.

### B. Substantial Impairment & Nonconformity

**{¶33}** The trial court concluded as a matter of law that Clayborne's issues with his vehicle were "not 'major defects' that substantially impair[ed] the vehicle." Clayborne challenges this ruling, arguing that whether the vehicle suffered from a "defect or condition" that "substantially impair[ed] the use, value, or safety of [the] vehicle to the consumer," R.C. 1345.71(E), was a disputed question of material fact.

**{¶34}** "Not all defects constitute a nonconformity under [Ohio's Lemon Law]. Rather, the defect or condition must 'substantially impair the use, value, or safety of a motor vehicle to the consumer.'" *Fagen v. Jaguar Land Rover N. Am., LLC*, 2023-Ohio-4324, ¶ 33 (1st Dist.), quoting R.C. 1345.71(E). R.C. 1345.71(E) defines "nonconformity" to include "any defect or condition that [1] *substantially impairs* the use, value, or safety of a motor vehicle to the consumer *and* [2] does not conform to the express warranty of the manufacturer or distributor." (Emphasis added.) A defect will only substantially impair the vehicle's use, value, or safety if it is a "major defect," and not merely a "cosmetic or other trivial" issue. *Royster*, 2001-Ohio-212, at ¶ 17. Thus, we have said that a "mere bothersome condition is an insufficient basis for a cognizable nonconformity." *Fagen* at ¶ 33, citing *Iams*, 2007-Ohio-6709, at ¶ 13 (3d

Dist.).

**{¶35}** The statutory text directs the court to judge nonconformity by assessing how the defect impaired the "use, value, or safety of the vehicle *to the consumer*." (Emphasis added.) R.C. 1345.71(E). Courts have debated whether this text requires a subjective test, or whether an objective test is more appropriate. *See generally Iams* at ¶ 24-44 (surveying Ohio cases addressing this issue). This court has applied an objective standard that takes into account "the consumer's viewpoint and circumstances." *Fagen* at ¶ 34. Thus, in assessing impairment to value or safety, we consider the resale value of the vehicle and whether the safety features would have operated as designed. *Id.* at ¶ 37 and 39. However, in assessing whether the defect impaired the vehicle's *use* to the consumer, we look to how the consumer's usage of the vehicle was actually impacted—i.e., whether the consumer was unable to use the vehicle in the manner they normally would. *See id.* at ¶ 37-38.

**{¶36}** In judging whether an alleged defect substantially impaired a vehicle's use, we have said the "consumer's personal belief is relevant, but that belief must be objectively reasonable." *Id.* at ¶ 34. Hence, a defect that shakes a user's confidence in a vehicle, thereby causing her to drive it less frequently than she otherwise might, *could* "substantially impair" that consumer's use of her vehicle, so long as the factfinder determines her shaken belief to have been objectively reasonable under the circumstances. *See id.* at ¶ 38 ("Considering Fagen's asserted shaken faith in the vehicle and the evidence of Fagen's diminished use, a reasonable person could find the defect or condition substantially impaired Fagen's use of the vehicle.").

**{¶37}** Clayborne's complaint and brief alleged two, potentially related defects: (1) an inability to start his vehicle (the "no-start issue") and (2) an inability to unlock his vehicle, except by manual means (the "no-unlock issue"). However, at oral

argument, Clayborne's counsel conceded that the no-unlock issue, standing alone, did not constitute a substantial impairment. As such, the no-unlock issue cannot be a nonconformity within the meaning of the statute.

**{¶38}** This leaves Clayborne's no-start issue. Common sense dictates that a driver's inability to start his vehicle on command could substantially impair his use of that vehicle. Clayborne testified that both the app and button methods failed him on three occasions: the incidents on 2/17/2021, 11/23/2021, and 11/29/2021.

**{¶39}** Thus, a jury could find that Clayborne's inability to start his vehicle on command by any normal method on these three occasions objectively impaired his use of the vehicle. Clayborne was forced to wait, often in the cold, for roadside assistance, for someone to pick him up, or for his car to work again. These waits delayed his travel, sometimes by hours. To the extent any delay in getting a vehicle to start could constitute a de minimis defect, a delay measured in hours certainly would not qualify.

**{¶40}** Based on Clayborne's evidence, we hold that a factfinder could determine that his vehicle failed to start on command on 2/17/2021, 11/23/2021, and 11/29/2021, and that this failure substantially impaired Clayborne's use of his vehicle. We therefore hold that disputes of fact preclude summary judgment on the question of whether a "nonconformity" existed under R.C. 1345.71(E).

### C. Three-Unsuccessful-Repairs Rule [R.C. 1345.73(A)(1)]

**{¶41}** R.C. 1345.73(A)(1) provides that "it shall be presumed that a reasonable number of attempts have been undertaken" if, within a year or 18,000 miles, "[s]ubstantially the same nonconformity has been subject to repair three or more times and either continues to exist or recurs." Thus to assess whether this presumption applies, we ask (1) whether the vehicle underwent repair three times in the first year for "substantially the same nonconformity," and (2) whether that nonconformity

recurred or continued to exist after that third repair.

**{¶42}** In deposition testimony, Clayborne conceded that he believed his issues were fixed following Repair #4. Thus, for Clayborne to prevail under the (A)(1) presumption, he must show that the no-start issue—the only plausible "nonconformity"—was "subject to repair" during all three preceding repair attempts (Repairs #1, #2, and #3), and recurred or continued after the third. We hold that, while Clayborne offered evidence sufficient to create a factual dispute with respect to Repairs #1 and #2, he has failed to do so with respect to Repair #3.

**{¶43}** Prior to Repair #1, during the incident on 2/17/2021, Clayborne testified that he could not start his vehicle by pressing the physical button. The service invoice for Repair #1 also clearly stated that Clayborne told the staff that his "vehicle would not start."[1] The service invoice then goes on to describe how the "engine started fine when bringing into the shop for diagnosis"—suggesting that they were concerned about the engine starting at all. A jury could conclude, from the deposition and invoice, that the vehicle was subject to repair for the no-start defect during Repair #1.

**{¶44}** During the incident on 11/3/2021, prior to Repair #2, Clayborne testified that he did not try to start the car with the physical button, because he could not enter his locked vehicle without setting off the alarm. His remote-start feature, however, did not start the car. And based on his experience from the incident on 2/17/2021, he raised the no-start issue when he brought his vehicle in for Repair #2. The service invoice for this visit suggests, again, that Clayborne's concern touched on the inability of the car to start at all, rather than merely the inability to start it remotely. As such, a jury *could* conclude that Repair #2 addressed the no-start issue as well.

---

[1] We have normalized the capitalization in quotations from service invoices, which employ capital letters almost exclusively.

**{¶45}** Clayborne did not carry his burden to provide evidence that the no-start issue was addressed as part of Repair #3, however. That repair attempt followed the incident on 11/6/2021, during which Clayborne *was* able to start the vehicle without setting off the alarm. And, while the service invoice for Repair #3 included a note that "the vehicle did not start" in recounting Clayborne's statement, the actual service notes suggest that they checked "KeylessGo" and various software issues. Nothing suggests any concern about a total inability to start the vehicle—only an inability to start the vehicle *remotely*.

**{¶46}** This makes Repair #4 only the *third* attempt to repair the no-start defect. And after this third time, Clayborne testified his problems were solved. Therefore, Clayborne has not offered evidence sufficient to create a dispute of material fact as to whether "[s]ubstantially the same nonconformity" persisted after being "subject to repair three or more times." R.C. 1345.73(A)(1). We hold that the trial court did not err in granting summary judgment for MBUSA on that issue.

### D. 30-Days-Out-of-Service Rule [R.C. 1345.73(A)(2)]

**{¶47}** Finally, Clayborne contends that disputes of material fact remain regarding whether he has satisfied the 30-days-out-of-service presumption. R.C. 1345.73(A)(2) creates a presumption that a reasonable number of repair attempts have been undertaken if the "vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days" within the first year.

**{¶48}** Clayborne first contends that the trial court misinterpreted the statute by failing to distinguish between R.C. 1345.73(A)(1), which uses the word "nonconformity," and (A)(2), which does not:

> (A) . . . [I]t shall be presumed that a reasonable number of
> attempts have been undertaken . . . if, during the period of one year

16

following the date of original delivery or during the first eighteen thousand miles of operation, whichever is earlier, any of the following apply:

(1) Substantially the same nonconformity has been subject to repair three or more times and either continues to exist or recurs; [or]

(2) The vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days . . . .

R.C. 1345.73(A)(1) and (2). Thus, Clayborne contends, the trial court erred by requiring him to show a nonconformity or substantial impairment in order to prevail on his (A)(2) claim.

{¶49} Clayborne would have a fine statutory-interpretation argument, if these were the statute's only provisions. But R.C. 1345.73(A) merely defines the applicable statutory presumptions. It does not impose a duty on the manufacturer, nor provide a cause of action or a remedy to the consumer—these come from R.C. 1345.72(A) and (B), both of which expressly require "nonconformity." R.C. 1345.72(A) imposes a statutory duty to repair on the manufacturer only if the "consumer reports the *nonconformity*" within the statutorily-prescribed period. (Emphasis added.) And R.C. 1345.72(B) conditions a plaintiff's recovery on proof that the manufacturer or dealer failed to "repair[] or correct[] any *nonconformity* after a reasonable number of repair attempts." (Emphasis added.)

{¶50} Put simply: every Lemon Law cause of action requires the plaintiff to show they "report[ed] the *nonconformity*" within the statutorily-required period, and requires manufacturers to "repair[] or correct[] any *nonconformity*" in "a reasonable number of attempts" to avoid liability. R.C. 1345.72(A) and (B). Without proof of

17

nonconformity, there is no duty, no cause of action, and no remedy under the Lemon Law. And "nonconformity" means *both* that the vehicle had a defect or condition that made it fail to conform to warranty, *and* that said defect or condition "substantially impairs the use, value, or safety of a motor vehicle to the consumer." R.C. 1345.71(E).

**{¶51}** The absence of the word "nonconformity" from R.C. 1345.73(A)(2) simply indicates that the plaintiff need not point to any *single* nonconformity that caused the vehicle to be out-of-service for 30 or more days. Thus, while under (A)(1) "substantially the same" nonconformity must have been addressed in all three repairs, under (A)(2) the plaintiff may rely on a series of repairs for *various nonconformities*.

**{¶52}** So, under (A)(2), we ask: How many days was Clayborne's vehicle out of service because it was in the shop to repair a "nonconformity"?

**{¶53}** In its brief, MBUSA accepts "that during Mr. Clayborne's first year of ownership—from December 27, 2020, to December 27, 2021—the vehicle was in the possession of the dealership on 33 separate calendar days." From the record, MBUSA plainly based its 33-day total on the following math:

| | |
|---|---|
| *Repair #1* | 1 day |
| *Repair #2* | 1 day |
| *Repair #3* | 2 days |
| *Repair #4 (through 12/27/2021)* | 29 days |
| **TOTAL:** | **33 days** |

The first three of these day counts match those in Clayborne's brief, while the duration of Repair #4 is shortened to cut it off at the end of the one-year period. Because the parties seem to agree on the method of counting, we accept these tallies of how many

days the vehicle was "out of service by reason of repair" within the first calendar year for purposes of appeal. [2]

**{¶54}** If all 33 days were counted under the statute, our inquiry would be over—33 is more than 30. However, we must limit our assessment to those periods of service for *nonconformities*—and the only nonconformity remaining is the no-start defect. For the reasons discussed in the preceding section, there are factual disputes as to whether Repairs #1 and #2 addressed the no-start defect, but not Repair #3. Repair #4, however, plainly addressed the no-start issue—indeed, Repair #4 is when that issue was fixed. Subtracting Repair #3 from MBUSA's total leaves us with 31 days out of service. Thus, under the method of calculation employed by MBUSA, we hold that Clayborne presented evidence that his vehicle was out of service for repair of a nonconformity for a total of 31 days within the first year.

**{¶55}** Nevertheless, MBUSA argues that supply-chain issues caused by the COVID-19 pandemic contributed to the delay in completing Repair #4, tolling the 30-day deadline found in R.C. 1345.73(B). That provision commands that any statutory-presumption period in R.C. 1345.73(A) "shall be extended by any period of time during which the vehicle could not be reasonably repaired due to . . . natural disaster." R.C. 1345.73(B)(1).

**{¶56}** This court has held "that the pandemic constitutes a natural disaster" for the purposes of (B)(1). *Fagen*, 2023-Ohio-4324, ¶ 29 (1st Dist.). But the statutory language does not say that the period shall be extended "by any period of time during which there is a natural disaster." The statute requires causation. The party seeking to

---

[2] We do not address whether this represents the correct method for counting days and calculating durations under R.C. 1345.73(A)(2). We have found no on-point authority on that issue, and the parties have not disputed or briefed this question. And, as we explain in this section, Clayborne prevails even under the method of counting and calculation MBUSA employed in its brief.

extend the statutory period must show that the failure to repair the vehicle was "*due to*" the natural disaster. In *Fagen*, for example, we rejected the defendant-manufacturer's tolling request, because it had "not explained why 'the vehicle could not be reasonably repaired' *because of COVID-19* before [the mechanic's] quarantine." (Emphasis added.) *Id.* at ¶ 30.

{¶57} As *Fagen* suggests, the burden of proving this causation logically falls upon the party asserting the affirmative defense: the defendant-manufacturer. The only evidence MBUSA cites to prove causation is the affidavit of MBC's service director, Brian Hackney. Hackney's affidavit and the service invoice for Repair #4 show that the repair to Clayborne's vehicle required "a new 'F152/4 bracket.'" Hackney avers that "[n]ormally, an MBUSA dealership receives a replacement part like an F152/4 within approximately 1-3 business days," but that "due to COVID-19 supply chain problems in 2021, the replacement part took 19 days to arrive."

{¶58} Whether the delay in repairing Clayborne's vehicle was "due to" the COVID-19 pandemic presents a factual question for the jury. While Mr. Hackney may be MBC's service director, he has not asserted qualifications as an expert on the causes of international logistics backlogs. He could certainly speak from personal knowledge about how, pre-COVID, getting a part like the one used on Clayborne's vehicle would have taken 1-3 days, while this time, it took 19. But Hackney offered no further personal knowledge that would have substantiated his causal allegation. Unsubstantiated and conclusory causal allegations in a lay-manager's affidavit for his parent organization are not adequate to support claims regarding the complex causes of international supply-chain failures. And the mere correlation between increased lead times and the onset of the pandemic, while probative, are not enough to justify a grant of summary judgment.

20

**{¶59}** We therefore hold that there exist triable issues of fact as to whether Clayborne's vehicle was "out of service by reason of repair" of the no-start issue "for a cumulative total of thirty or more calendar days" within the first year, and we reverse the trial court's summary judgment on that issue.

## IV. MAGNUSON-MOSS WARRANTY ACT ("MMWA") CLAIM

**{¶60}** The MMWA, 15 U.S.C. 2301 et seq., is "the federal statute that sets forth guidelines, procedures and requirements for warranties, written or implied, on consumer products." *Temple v. Fleetwood Ents.*, 133 Fed.Appx. 254, 268 (6th Cir. 2005). Congress passed the statute in 1975, "in response to what it perceived to be widespread misuse by merchants of express warranties and disclaimers." *Curl v. Volkswagen of Am., Inc.*, 2007-Ohio-3609, ¶ 10. The MMWA "creates a cause of action for a consumer damaged by the failure of warrantor to comply with its obligations under a written warranty or under the Act." *Sharkus v. Daimler Chrysler Corp.*, 2002-Ohio-5559, ¶ 11 (8th Dist.), citing 15 U.S.C. 2304(a)(4). However, the act *adopts* rather than supplants state warranty law, providing additional standards for the enforcement and modification of those warranties. *Curl* at ¶ 10.

**{¶61}** "[T]o present a valid claim under the MMWA, a plaintiff must establish the following: '(i) the item at issue was subject to a warranty; (ii) the item did not conform to the warranty; (iii) the seller was given reasonable opportunity to cure any defects; and (iv) the seller failed to cure the defects within a reasonable time or a reasonable number of attempts.'" *Cox v. Kia Motors Am., Inc.*, 2011-Ohio-1231, ¶ 13 (1st Dist.), quoting *Iams*, 2007-Ohio-6709, at ¶ 57 (3d Dist.).

**{¶62}** There is no dispute that Clayborne's vehicle was subject to a warranty, nor that the defects alleged by Clayborne and repaired without charge by MBUSA were covered by that warranty.

**{¶63}** Some courts, including Ohio's Third District, have adopted the view that the MMWA's nonconformity prong incorporates the UCC requirement that, for goods to be considered nonconforming, "they must have a defect that substantially impairs their value to the buyer." *Iams* at ¶ 60, citing R.C. 1302.66(A). This court has not squarely so held, and, it is not immediately clear to us why the requirement for revoking acceptance under the UCC should alter our understanding of whether goods "conform to the warranty" for MMWA purposes. Nevertheless, even assuming that the Third District's substantial-impairment test is correct, the question of "[w]hether a complained of nonconformity substantially impairs an item's worth to the buyer [under R.C. 1302.66(A)] is a determination exclusively within the purview of the fact-finder and must be based on objective evidence of the buyer's idiosyncratic tastes and needs." *McCullough v. Bill Swad Chrysler-Plymouth, Inc.*, 5 Ohio St.3d 181, 186 (1983). Thus, given the same evidence addressed above, there is at least a dispute of material fact as to whether the no-start issue impaired the vehicle's value to Clayborne.

**{¶64}** Further, there is no real dispute that MBUSA and its agents were "given reasonable opportunity to cure any defects." Clayborne testified that, after Repair #4 at an MBUSA-authorized provider, the defects were cured.

**{¶65}** But there is a dispute on the final prong: whether MBUSA "failed to cure the defects within a reasonable time or a reasonable number of attempts." *See Cox*, 2011-Ohio-1231, at ¶ 13 (1st Dist.). The MMWA "contemplates that a seller 'will be given at least two chances to remedy an alleged defect.'" *Temple*, 133 Fed.Appx. at 268, quoting *Teerling v. Fleetwood Motor Homes of Indiana, Inc.*, 2001 U.S. Dist. LEXIS 7481, at *16 (N.D.Ill. June 4, 2001). Beyond this, it appears that whether the number of repair attempts was reasonable will "usually [be] a question of fact." 1 Gregory M. Travalio, *Anderson's Ohio Consumer Law Manual*, § 16.12 (Matthew Bender,

Rev.Ed.). Clayborne's vehicle was subject to more than two repairs. And much of the evidence going to Clayborne's Lemon Law presumptions could be used to raise similar questions about reasonableness in this context.

**{¶66}** We hold that there are disputed issues of material fact on the contested prongs of Clayborne's MMWA claim, and that the trial court therefore erred in granting summary judgment for MBUSA on that claim.

### V. OHIO CONSUMER SALES PRACTICES ACT ("CSPA") CLAIM

**{¶67}** Finally, Clayborne contends that the trial court erred in granting summary judgment for MBUSA on his claim under Ohio's CSPA, R.C. 1345.01 et seq. The relevant section of the CSPA provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. 1345.02(A). Generally, the CSPA "defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving." *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 24; *accord Hathorn v. Dana Motor Co., LLC*, 2016-Ohio-5110, ¶ 13 (1st Dist.). Although claims under R.C. 1345.02(A) require proof of deception, they do not require "[p]roof of knowledge or intent" as a separate element, except where the CSPA specifically so states. *Boyle v. Daimler Chrysler Corp.*, 2002-Ohio-4199, ¶ 73 (2d Dist.). While the CSPA provides a nonexclusive list of deceptive acts in R.C. 1345.02(B), the plaintiff may go beyond this list in stating his case, so long as he "'show[s] a material misrepresentation, deceptive act or omission' that impacted his decision to purchase the item at issue." *Temple* at 265, quoting *Mathias v. Am. Online, Inc.*, 2002-Ohio-814, ¶ 41 (8th Dist.).

**{¶68}** Ohio courts "have held that a manufacturer's breach of warranty can constitute a violation of the CSPA." *Lester*, 2022-Ohio-1776, at ¶ 38 (1st Dist.), citing *Boyle* at ¶ 74, and *Layne v. McGowen*, 1995 Ohio App. LEXIS 2120 (2d Dist. May 24,

1995). But, while a breach of a warranty *can* amount to a violation under R.C. 1345.02, not every breach of a warranty will be an unfair or deceptive practice. Thus, a breach of an express warranty would logically rise to the level of a CSPA violation if the warranty were untrue, misleading, or not honored.

**{¶69}** Clayborne has not explained what was "deceptive" about the warranty that came with his vehicle. That warranty guaranteed that MBUSA's authorized dealers would "make any repairs or replacements necessary to correct defects in material or workmanship, but not design, arising during the warranty period." And one of MBUSA's dealers *did* make the repairs, once it had accurately identified the issue as part of Repair #4. Further, it is difficult to imagine how Clayborne could have been deceived by promises in his warranty, as deposition testimony revealed that he had not read the terms of his warranty prior to his purchase.

**{¶70}** Because Clayborne offered no evidence that he was deceived by his warranty, we hold that the trial court correctly granted summary judgment in MBUSA's favor on Clayborne's CSPA claim.

## VI. CONCLUSION

**{¶71}** For the foregoing reasons, we sustain Clayborne's sole assignment of error in part and overrule it in part. The trial court erred in granting summary judgment for MBUSA on Clayborne's Lemon Law claim, insofar as that claim applied the 30-day presumption in R.C. 1345.73(A)(2) to the no-start issue. The trial court further erred in granting summary judgment for MBUSA on Clayborne's MMWA claim. We therefore reverse the trial court's grant of summary judgment with respect to these issues and claims, affirm its summary judgment on all others, and remand the cause to the trial court for further proceedings consistent with this opinion.

Judgment accordingly.

**BERGERON, P.J.,** and **WINKLER, J.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.